UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

------------------------------------------------------------X
DISNEY ENTERPRISES, INC., et al.

                    Plaintiffs,                    No. _____

        v.

DOES 1 - 10

                    Defendants.
------------------------------------------------------------X

## DECLARATION OF CHAD TILBURY IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

I, Chad Tilbury, declare:

1. I am Director of Worldwide Internet Enforcement for the Motion Picture Association of America, Inc. ("MPAA"), where I have been employed since July 2004. Prior to the MPAA, I spent five years as a Special Agent in the Air Force Office of Special Investigations where I was responsible for computer investigations and operations. I have an M.S. and a B.S. in Computer Science and have also worked as an Artificial Intelligence researcher and a computer security engineer in the defense industry. I submit this declaration in support of Plaintiffs' Motion for Leave to Take Immediate Discovery.

2. All of the Plaintiffs in this action are motion picture studios and/or distributors, among whom are members, or affiliates or subsidiaries of members, of the MPAA. The MPAA is a trade association whose members include the largest motion

picture studios in the United States. Among other things the MPAA investigates the unauthorized reproduction and distribution of copyrighted motion pictures and television programs on behalf of its member companies. As Director of Worldwide Internet Enforcement, I am responsible for coordinating the MPAA's worldwide enforcement effort against internet piracy. This includes supervision of our online copyright infringement campaign, identification and development of Internet anti-piracy technologies, investigations of major online infringers and coordination of Internet anti-piracy efforts around the globe.

3. This declaration is based on my personal knowledge, and if called upon to do so, I would be prepared to testify as to its truth and accuracy.

## BACKGROUND: THE INTERNET, P2P, AND BITTORRENT

4. The Internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows hundreds of millions of people around the world to freely and easily exchange ideas and information, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data. Unfortunately, the Internet also has afforded opportunities for the wide-scale infringement of copyrighted motion pictures. Once a motion picture or television program has been transformed into an unsecured digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

5. To copy and distribute copyrighted motion pictures and television programs over the Internet, many individuals use online media distribution systems or so-

called "peer-to-peer" ("p2p") networks. p2p networks, at least in their most common form, are computer systems that enable Internet users to: (1) make files (including motion pictures and television programs) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

6. At any given moment, millions of people around the world unlawfully use these p2p networks to upload (distribute) or download (copy) copyrighted material. The p2p systems represent a "viral" distribution of digital files: each user of the system who copies a digital file from another user can then distribute the file to still other users and so on, so that almost-perfect copies of an infringing file can be distributed to millions of people worldwide with breathtaking speed. Significantly, a person who uses a p2p network is free to use any alias (or "screen name") whatsoever, without revealing his or her true identity to other users. Hundreds of thousands of copyrighted movies and television programs are reproduced and distributed on networks like BitTorrent each day.

7. BitTorrent differs from other p2p networks in several respects, but perhaps most important is its speed: BitTorrent allows much faster copying of large files than earlier p2p networks, such as Napster and Kazaa. For that reason, BitTorrent has become one of the preferred systems for illegally copying and distributing large, copyrighted video files, such as movies and television programs. Currently, the BitTorrent network offers individuals around the world perfect digital copies of any movie they desire for free – including unauthorized copies of movies that have not yet been released in theaters and television programs that have not yet been broadcast.

8. On the BitTorrent network, individuals seeking to download Plaintiffs' television programs must utilize torrent sites to locate the files they want, and must connect to online tools called trackers to access other users who are uploading the files the users seek. The torrent site tells users what files are available, and the tracker tells the user's computer – behind the scenes – where to find the desired file. All of this is seamless; from the user's perspective, he or she need only click on the desired television program, and the show will be downloaded for free. The television programs available for a user to download are limited by what files the operator of the torrent site and tracker chose to make available. If either the torrent site or the tracker exclude Plaintiffs' copyrighted works, then users will be unable to download the infringing content using Defendants' torrent site and tracker. In this respect, the content available on the network is defined entirely by what files the operators of torrent sites and trackers choose to host. Operators, who often include advertisements or charge membership fees on their sites in order to generate revenue, can choose to make available, or not to make available, any particular file.

9. As with individuals on other p2p networks, an individual who operates a BitTorrent torrent site or tracker, like the Doe Defendants here, may choose not to use even a moniker but rather to remain anonymous; typically, torrent site and tracker operators either remain completely anonymous or use an alias or user name. Thus, while Plaintiffs can observe the infringement occurring on the Internet, they do not know the true names or home addresses of those individuals who are committing the infringement.

10. Because the Plaintiffs have not authorized their copyrighted motion pictures to be copied or distributed in unsecured formats by means of p2p networks, the copying and distribution of these motion pictures on p2p networks violates the copyright laws.

## PLAINTIFFS' IDENTIFICATION OF THE DOE DEFENDANTS

11. In order to combat copyright infringement on p2p networks, the MPAA, counsel for Plaintiffs, and those working under counsel's direct supervision reviewed Defendants' torrent site, www.btefnet.net, in search of motion pictures or television programs whose rights are owned by Plaintiffs. Several files on the torrent site that were labeled with the names of certain of Plaintiffs' copyrighted television programs were downloaded. The file, the movie or program, and additional identifying information were obtained, and the downloaded files were reviewed in order to confirm that the files were in fact copies of substantial portions of television programs whose rights are owned by Plaintiffs. The MPAA also recorded the time and date at which the infringing activity was observed and the IP address assigned to the Defendants' website and trackers. The MPAA could not, however, determine the physical location of the Defendants or their identities. The MPAA could determine which ISP the Defendants were using to host their torrent site and trackers.

12. In addition, information regarding the Internet Protocol ("IP") address of the torrent site and the IP address of the trackers that worked behind the scenes to assist in the file-sharing process were obtained.

13. Copyright owners have frequently used the subpoena processes of Federal Rule of Civil Procedure 45 and the Digital Millennium Copyright Act ("DMCA") to obtain the names of infringers from ISPs or other entities. (Individuals only can gain access to the Internet after setting up an account with, or subscribing to, an ISP.) Typically, such a subpoena to an ISP would include an IP address and a date and time on which the IP address was observed in allegedly infringing activity. In some instances, providing the IP address alone to the ISP has been enough to enable the ISP to identify the infringer. Providing the date and time further assists some ISPs in identifying infringers, especially if an ISP uses "dynamic IP addressing," whereby a single computer may be assigned different IP addresses at different times, including, for example, each time it logs into the Internet.[1] Once provided with the IP address, plus the date and time of the infringing activity, the infringer's ISP quickly and easily can identify the computer from which the infringement occurred (and the name and address of the subscriber that controls that computer), sometimes within a matter of minutes, using logs that the ISP maintains that match IP addresses (along with the date and time) with particular subscribers.

14. Although the IP address for a website such as a torrent site likely is static, not dynamic, whether the IP address for a tracker server is static or dynamic may depend on the nature of the Internet service that the customer uses. Trackers connected through

---

[1] ISPs own or are assigned certain blocks or ranges of IP addresses. An ISP assigns a particular IP address in its block or range to a subscriber when that subscriber goes "online."

consumer broadband ISPs are typically dynamic; trackers connected through commercial hosting services are more likely static.

15. Since 1998, copyright owners such as the MPAA have sent thousands of subpoenas to learn the names, addresses, telephone numbers, and e-mail addresses of infringers for the purpose of bringing legal actions against those infringers. In more than a hundred cases involving individuals uploading and downloading copyrighted movies and sound recordings, federal courts have authorized limited discovery virtually identical to that sought here, recognizing that absent such discovery, defendants would be able to continue to violate the law indefinitely. During one recent lawsuit with an ISP (Verizon) relating to the DMCA subpoena process, the ISP conceded that, as an alternative to the DMCA process, Plaintiffs could file "Doe" lawsuits and issue Rule 45 subpoenas to ISPs to obtain the true identities of infringing subscribers.

## THE IMPORTANCE OF EXPEDITED DISCOVERY IN THIS CASE

16. Obtaining the identity of copyright infringers on an expedited basis is critical to stopping the piracy of MPAA members' copyrighted works.

17. First, every day that copyrighted material is disseminated without the authorization of the copyright owner, the copyright owner is economically harmed. Prompt identification of infringers is necessary in order for copyright owners to take quick action to stop unlawful dissemination of their works and minimize their economic losses.

18. Second, infringement often occurs with respect to movies that have not yet been released publicly in the theatres. Such infringement inflicts great harm on the initial

market for new works. New movies generally earn a significant portion of their revenue when they are first released, and copyright piracy during a movie's pre-release or early release period therefore deprives copyright owners of an important opportunity to reap the benefits of their labor.

19. Third, without expedited discovery Plaintiffs have no way of serving Defendants with the complaint and summons in this case. Plaintiffs do not have the Defendants' names or addresses, nor do they have an e-mail address for Defendants.

20. Fourth, Plaintiffs need expedited discovery from Colocation Corporation and Managed Solutions Group. Although each ISP will have information regarding the identity of an individual who contracted with that ISP for service, there is no guarantee that each ISP will identify the same individual responsible for the torrent site and trackers. Serving a subpoena on only one entity may not lead to the discovery of all defendants who have been involved with the infringing site.

21.   Fifth, and perhaps most critically, service providers have different policies pertaining to the length of time they preserve "logs" that identify their users. ISPs keep log files of their user activities for only limited periods of time – which can range from as short as a few days, to a few months – before erasing the data they contain. If an ISP does not respond expeditiously to a discovery request, the identification information in the ISP's logs may be erased, making it impossible for the ISP to determine the identity of the infringer and eliminating the copyright owner's ability to take action to stop the infringement. This problem is especially troubling for dynamic IP addresses, which change frequently.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _April 28_, _05_, at _Encino, CA_.

_____
Chad Tilbury